ST. LOUIS SOUTHWESTERN RAILWAY COMPANY *v.* BRUMMETT.

4-6041 143 S. W. 2d 555

Opinion delivered October 14, 1940.

[redacted]

*Gaughan, McClellan & Gaughan,* for appellant.

*Danaher & Danaher* and *E. W. Brockman,* for appellee.

MEHAFFY, J. On January 31, 1939, appellee instituted this suit against the appellant alleging that she was injured by the negligence of appellant on September 28, 1936. Appellee was in business and the appellant had placed a car on a switch adjacent to appellee's warehouse, which car was being unloaded, having been placed there for that purpose, and the stage plank was placed with one end in the railroad car and the other end extending into the building occupied by appellee. While the car was being unloaded a coupling was made. One of the employees of appellant, a member of the switching crew, came to the door of the warehouse and said he had to move the car that was being unloaded. The appellee immediately took hold of the handles of the truck upon which the plank rested in the warehouse for the purpose of assisting her employees in removing the stage plank from the car so that it could be moved safely; that while appellee had hold of the truck handles appellant's servants in charge of the switch engine caused it and the cars connected to it to strike against

the car she was assisting to unload and knock the plank against the appellee with great violence, throwing her to one side a distance of several feet, severely bruising and wounding her; that it gave her severe headaches for a long time followed by extreme stiffness, rigors, dizziness and high blood pressure, and causing her to be confined to her bed at intervals ever since; that she was immediately confined to her bed for two months after the accident; her nerves were so shocked that she could not sleep for many months thereafter without taking sedatives; she still suffers constantly from traumatic neurosis, hypertension, and pinched spinal nerves caused by said shock; her blood pressure runs as high as 225, and she has severe pain in her neck and back and extreme dizziness upon turning her head; that her injuries were caused by negligence of appellant's servants in backing the switch engine and train into said car while she was attempting to remove the plank; that her injuries are permanent and she will continue to suffer therefrom throughout her entire life.

Appellant filed answer denying each and every material allegation of the complaint, and pleading appellee's contributory negligence.

An amendment was filed to the complaint alleging that it was the duty of appellant's employees to keep a constant lookout for persons and property, and that appellant's employees operating the switch engine neglected and failed to keep such lookout at the time she was injured, and if it had been kept her peril would have been discovered in time to have avoided the injury by the exercise of ordinary and reasonable care.

There was a verdict and judgment for the appellee in the sum of $5,000; motion for new trial was filed and overruled, and the case is here on appeal.

The evidence showed that appellee had lived in Pine Bluff all of her life, and that her place of business is located at 216-228 Chestnut Street; she is a partner in the business; she did the buying and some of the selling; was assistant manager and she did the check-

ing of the freight in and out; she either walked or rode to her work; has driven a car for 27 years; was always able to drive before she was hurt and has driven some since; the partnership has two warehouse doors on the track, and habitually uses the nearest—the east one; door is seven or eight feet in width; in conveying merchandise from the car into the warehouse they used two trucks; had a crew of about four, one in the house, one in the car, and one on each truck; takes two days, as a rule, to unload those cars; the stage was placed in the usual way; it was the custom in unloading cars to raise the edge of the stage, the end that stays in the warehouse, and place a hand truck under it; the truck has two wheels and handles back at the end; two men hold the handles and the other man is supposed to push the truck under the end of it and raise that end; appellee understood that the name of the man who asked her to move the stage was Dobbins, the switchman; the switchman put his head in the door and saw the stage in position showing that they were working on the car; this man told them to get the board out of there; appellee told him he would have to wait until she could get another man; they usually stand there until the car is cleared; when witness told the switchman he would have to wait, the switchman turned to a boy and told him to catch hold of the board; the end of the stage was raised and witness pushed the truck under; switchman was standing in a position where he could easily see in the warehouse; appellee was looking down at what she was doing; she had to take hold of the handles; the board was heavy; her hands were about 24 inches from the floor; her head was down and the first thing she knew she was over by the door; was jerked over there by the operation of the engine; the engine struck before they ever lifted the stage; she felt like she had been in an explosion and like her arms had been pulled out the sockets, and her neck was stiff. Appellee then described her injuries and the treatment.

Dr. Luck and Dr. Causey testified about appellee's injuries.

—PAGE 56]

W. M. Kincannon, Ona Hampton, Glenn A. Railsback, Lawrence Sims, Dr. E. G. Campbell, and Dr. W. C. Campbell testified for appellee. Several witnesses testified for appellant.

Appellant's first contention is that there is not sufficient evidence of negligence to support the verdict. It is undisputed that the appellee was in business there, and had received a car of freight which was placed adjacent to her warehouse to be unloaded; that she was unloading it, and in order to do so, she placed a plank from the door of the car to the door of the warehouse; while she was thus engaged in unloading her freight, a switchman came to her and told her to take the plank down; that they were going to move the engine; she immediately proceeded to carry out this order, and while she was trying to remove the plank, appellant's engine struck the car and injured appellee. The switchman testified that it was his duty to give this order, and that he did not look back or signal the engine. It was the duty of the appellant, when appellee was ordered to remove the plank, to give her time to remove it and get out of danger. There is no evidence in the record showing that they gave her any time or any warning, but while she was attempting to comply with appellant's order, the engine was run against the car, and there is no evidence that there was any lookout kept.

In support of his contention, the appellant cites *De Queen & Eastern Rd. Co.* v. *Pigue*, 135 Ark. 499, 205 S. W. 888. In that case the court said: "The car was moved without any signal or warning to those engaged in unloading the freight from it. It is well settled in this state that it is the duty of the carrier to exercise ordinary care in moving its cars to prevent injury to owners of freight and their employees rightfully engaged in loading or unloading cars."

Appellant also calls attention to and relies on *Mo. & N. A. Rd. Co.* v. *Duncan*, 104 Ark. 409, 148 S. W. 647. The court in that case copied with approval from 3 Elliott on Railroads, § 1265c, as follows: "Shippers and

consignees of freight on railroad premises for the purpose of loading and unloading cars are properly there .... and the railroad company is bound to use reasonable care to avoid injuring them while so engaged. If such persons, while so engaged and without negligence on their part other than that in attention to their own safety which an absorption in the duties in which they are engaged naturally produces, are hurt by the negligence of the railroad company, they have an action for damages", and the court then said: "and it is further said that it is the duty to warn such shippers or consignees of the intention to switch cars over a track on which their car is placed, and that such persons do not assume the risk of injuries arising from this cause."

Appellant also calls attention to the case of *M. D. & G. Rd. Co.* v. *Yandell,* 123 Ark. 515, 185 S. W. 1096. In that case the court said: "The car had been turned over to the shipper by the railroad agent for the purpose of loading it. The plaintiff was employed by the drayman to assist in loading the goods into the car. Hence he was rightfully in the car and it was the duty of the defendants to exercise ordinary care in giving notice or warning of the intention to make the coupling."

The appellant then refers to *Little Rock & Hot Springs Western Rd. Co.* v. *McQueeney,* 78 Ark. 22, 92 S. W. 1120. In that case the defendant railroad company objected to instruction No. 1 of the plaintiff, because it made applicable the lookout statute, and the railroad company argued that this act did not require a lookout to be kept by persons running cars and engines in a railroad yard, and the court said: "To sustain this contention, it will be necessary to hold that the tracks in the yards do not constitute a part of the railroad. But this is not true. Every track necessary to its operation is a part of the railroad. The act was obviously intended for the protection of persons and property upon railroad tracks, and all tracks and cars moved thereon come within its provisions. Persons and property upon any railroad track need and are entitled to its protection. The act makes no exceptions, and ap-

plies to all cases which come within the mischief intended to be remedied and within its object.''

In the case of *Kelly* v. *DeQueen & Eastern Rd. Co.*, 174 Ark. 1000, 298 S. W. 347, this court said: ''The effect of our holding in the former opinion is that, where proof has been introduced by the plaintiff of an injury to a person by the operation of a train under such circumstances as to raise a reasonable inference that the danger might have been discovered and the injury avoided if a lookout had been kept, then the burden is shifted to the railroad company to show that such lookout was kept.''

This court said in the case of *Mo. Pac. Rd. Co.* v. *Barham,* 198 Ark. 158, 128 S. W. 2d 353; ''The railroad company and its trustee could not defend against a failure to keep a lookout, nor under the doctrine of discovered peril by alleging that appellee was guilty of contributory negligence and the instruction so declaring was not error. The lookout statute itself abolishes contributory negligence as a defense to a failure to comply with its provisions.''

In this case there is no evidence that any lookout was kept. The engineer did not testify and the switchman who ordered the plank removed did not signal the engine or notify the engineer that the plank was being moved.

We think the appellant was clearly guilty of negligence in ordering appellee to remove the plank and then immediately, before she had time to remove it, without giving any warning, running the engine against the car.

It is next contended that the evidence is not sufficient to show that appellee's physical disabilities resulted from the alleged accident. The testimony of appellee clearly shows that her physical disabilities resulted from the accident, and there is no evidence to the contrary.

It is next contended that the verdict is excessive. Appellant calls attention to no authorities supporting

■■■■■■■■■■

this contention. Appellee testified that she felt like she had been in an explosion and like her arms had been pulled out of the sockets, and that her neck was stiff; her arms ached excessively, her shoulders were injured, and she could not rotate her head; if she turned her head, immediately everything seemed to go black; she had several spells in her room daily, and was unable to sleep at night until she started wearing a brace; Dr. Campbell of Memphis, a bone specialist, treated her and she afterwards got a brace and could walk around, but she had to use sedatives until she got a brace; she began wearing the brace in March; the brace is adjusted and pushes the other bones apart and the blood is supposed to pass between the vertebrae; she has restrictions in them; the brace holds the head off of her spine and keeps her head from moving back and forth and prevents the dizzy spells; she was injured in the back in four different places; the brace extends from one end of the spine to the other and buckles around her body with leather straps; it rests on the spine all the way down and buckles all the way around; she was never free from pain before she put the brace on and is not free from pain since, but has much less pain; she gets relief from it and is able to walk; the apparatus attached to her head was what Dr. Campbell called a head traction; it consists of a hood that goes over the head and there is a chain back of it with two links that cause the chain on the ball to go over a pulley with six pounds of weight on the pulley; at first she could not stand six pounds; she had some massage treatments and took baths at Hot Springs; she cannot tell accurately what she had expended, but it is around $1,250; she recently had an attack and dizzy spell and fell on the sidewalk; her earning capacity has been reduced $150 or $200 a month; she was 54 years old at the time of the trial; after the accident she had high blood pressure and is very nervous; Dr. Campbell of Memphis told her she had traumatic neuritis or neurosis; both neuritis and neurosis.

The evidence shows that the appellee is still suffering and will probably continue to do so. It will be seen

from the testimony that she lost five months; that her earning capacity was decreased; that she has to wear a brace on her spine constantly, and still suffers.

It has been repeatedly held that the amount of recovery in cases of this kind should be such as nearly as can be to compensate the injured party for the injury. The suit is for compensation, and compensation means that which constitutes or is regarded as an equivalent or recompense; that which compensates for loss or privation; remuneration; and this, of course, means not only for the loss of earning capacity and physical injury and inconvenience of wearing a brace, but also for suffering. *Mo. Pac. Rd. Co.* v. *Remel,* 185 Ark. 598, 48 S. W. 2d 548.

"While the discretion of the jury is very wide, it is not arbitrary or unlimited discretion, but it must be exercised reasonably, intelligently, and in harmony with the testimony before them. The amount of damages to be awarded for breach of contract, or in actions for tort, is ordinarily a question for the jury; and this is particularly true in actions for personal injuries and other personal torts, especially where a recovery is sought for mental suffering." *Coca-Cola Bottling Co. of Ark.* v. *Cordell,* 189 Ark. 1132, 76 S. W. 2d 307; *Coca-Cola Bottling Co. of Ark.* v. *Adcox,* 189 Ark. 610, 74 S. W. 2d 771.

The rule for the measure of damages in personal injury cases is stated in 17 C. J. 869, *et seq.,* as follows: "The measure of damages for a physical injury to the person may be broadly stated to be such sum, so far as it is susceptible of estimate in money, as will compensate plaintiff for all losses, subject to the limitations imposed by the doctrines of natural and proximate consequences, and of certainty, which he has sustained by reason of the injury, including compensation for his pain and suffering, for his loss of time, for medical attendants and support during the period of his disablement, and for such permanent injury and continuing disability as he has sustained. Plaintiff is not limited in his recovery to specific pecuniary losses as to which there is direct

proof, and it is obvious that certain of the results of a personal injury are insusceptible of pecuniary admeasurement, from which it follows that in this class of cases the amount of the award rests largely within the discretion of the jury, the exercise of which must be governed by the circumstances and be based on the evidence adduced, the controlling principle being that of securing to plaintiff a reasonable compensation for the injury which he has sustained."

The amount of the damages is left largely in the discretion of the jury, not only because the jury is the trier of facts, but they see the injured party, hear her testify, and have an opportunity to observe her physical condition.

Under the evidence in this case we cannot say that the verdict is excessive.

It is next contended that the court erred in refusing to submit to the jury the issue of contributory negligence. In the first place, there is no evidence tending to show that appellee was guilty of any negligence.

This court said, in the case of *Bumpas* v. *Sinclair Ref. Co.,* 191 Ark. 571, 87 S. W. 2d 29: "Usually the existence of contributory negligence which will bar a recovery is a question of fact for the jury's consideration and judgment. *Beal Doyle Dry Goods Co.* v. *Carr,* 85 Ark. 479, 108 S. W. 1053, 14 Ann. Cas. 48. But if the testimony in this regard be such that all reasonable minds must reach the same conclusion, then it resolves itself into a question of law. *Gibson Oil Co.* v. *Bush,* 175 Ark. 944, 1 S. W. 2d 88."

The evidence in this case shows that the engine was operated without any lookout being kept, and without any warning to appellee. Under such circumstances contributory negligence is not a defense. Section 11144, Pope's Digest; *Mo. Pac. Rd.* v. *Barham, supra.*

Appellee's instruction No. 1 was not erroneous, and the court did not err in giving that instruction.

The judgment is affirmed.